UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATHANIEL DANIELS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. Act. No. 05-245 (GK) |
| WILLIAM H. TURRI, ACTING PUBLIC PRINTER, U.S. Government Printing Office, | ) ) ) ) |
| Defendant. | ) |

## DECLARATION OF TERRANCE DUDLEY

I, Terrance Dudley, hereby declare:

1. I was Chief of GPO's Delivery Section until the end of February, 2003. I became Chief of the Delivery Section in 1999, and served in that position for approximately 4 years. As Chief of the Delivery Section, I was the supervisor of the section and all of its employees, including the Plaintiff in the above captioned matter, Mr. Nathaniel Daniels. I supervised Mr. Daniels for 1 year. I became Chief of Transportation Operations in the Production Department of the Government Printing Office at the end of February, 2003. In February of 2006, I assumed my current position, which is Chief of Warehouse Operations at GPO.

2. I have been asked to review certain statements and documents I signed concerning the events that Mr. Daniels claimed were discriminatory in the two administrative complaints of discrimination he filed with GPO (Agency EEO Complaints Nos. 03-09 and 03-21), which are now the subject of the above-captioned matter in the U.S. District Court. I have reviewed these



documents (set forth as Attachments 1 and 2 to this affidavit) and reiterate my belief that they are true and accurate. However, I would like to take this opportunity to further explain that I did not discriminate against Mr. Daniels.

3. On or about October 2, 2002, I conferred with my Deputy, Paul Kirby about dividing between ourselves the decisions to fill four vacant Grade 5 PPW Motor Vehicle Operator positions. I delegated the selection decisions under VA 02-243 to Mr. Kirby, while I made the selection decisions under VA 02-242.

4. Under VA 02-242, I selected Mr. Lamar Gamble and Ms. DeShawn McMillan. I generally based my selection on the applicants having previously made deliveries throughout the Washington, DC, metropolitan area. Specifically, I selected Mr. Gamble because he possessed greater experience making deliveries throughout the Washington, DC, metropolitan area than did the other candidates, including Mr. Daniels. I credited Mr. Gamble's experience as a helper on a particular delivery route (referred to as the "Back Bay Run") that makes deliveries ranging over wide area of the Washington, DC, metropolitan region. I also valued the fact that Mr. Gamble worked in the Delivery Section since November of 2001, which was a longer period of time than other employees, including Mr. Daniels. Applying the same criteria, I concluded that Ms. McMillan also possessed significant experience making deliveries and driving delivery vehicles in the Washington, DC, metropolitan area. I noted that Ms. McMillan worked for a delivery service and drove delivery vehicles transporting batteries to customers in the Washington, DC, region.

2

5. I concluded that Mr. Daniels did not have comparable work experience to either Mr. Gamble or Ms. McMillan. The delivery run on which Mr. Daniels served as a helper was limited only to Capitol Hill. Further, Mr. Daniels had no experience driving delivery vehicles. His prior delivery experience was limited to driving a U.S. Postal Service jeep delivering mail in Baltimore, MD, and driving a passenger van in Baltimore for Johns Hopkins University Hospital.

6. My decision to select Mr. Gamble and Ms. McMillan was not motivated by age. In fact, I learned after the selection that Mr. Gamble is actually slightly older than Mr. Daniels.

7. On or about October 16, 2002, Mr. Kirby and I verbally communicated our selections to each other. On October 16, 2002, I signed the selection certificates recommending Ms. McMillan and Messrs. Silas, Williams, and Gamble. Donald Ladd, former GPO Production Manager (currently retired), approved these selections later that day.

8. On December 19, 2002, I overheard Mr. Daniels and another Delivery Section employee, Mr. Walter Lancaster, discussing the time arrival of some, and leave usage and time card of another employee, in the vicinity of the Delivery Section time clock. During that discussion, I heard Mr. Daniels and Mr. Lancaster also discuss another employee's payroll number. I thought this discussion was completely inappropriate, because the information being discussed was confidential. I directed first Mr. Lancaster and then Mr. Daniels into my office to discuss the situation. I explained to Messrs. Lancaster and Daniels that monitoring other employees' time and attendance was not relevant to their job duties and they should not do so.

3

9. I assigned overtime work for the weekend of February 1 and 2, 2003. Employees working on Mr. Daniels' shift (5:00AM to 1:30PM) were scheduled to work overtime on Saturday, February 1, 2003, delivering the Congressional Record. Employees from a later shift were assigned to work overtime on Sunday, February 2, 2003, delivering copies of the Federal Budget.

10. On Friday, January 31, 2003, I alerted all the employees scheduled to work overtime on Saturday (including Mr. Daniels) that they were not to report for their scheduled overtime work on February 1 because the Congressional Record was not ready for delivery. The overtime assignments for the employees scheduled to work on Sunday, February 2, 2003, were not changed. However, despite being directed not to report for overtime during the upcoming weekend, Mr. Daniels came to the worksite on February 2 – which was not the date that employees from his shift were scheduled to work overtime - and insisted on working overtime. I ordered Mr. Daniels to leave the worksite. Def. Exhibit 5.

11. I have reviewed the attached February 6, 2003, memorandum (set forth as Attachment 3 to this affidavit), which I sent to GPO's Employee Relations office. I believe this document is truthful and accurately recounts Mr. Daniels' refusal to follow my instructions to remove partitions which he set-up in the workplace without authorization. However, I would like to add the following additional comments about the events which led to GPO proposing Mr. Daniels' removal.

12. On or about February 4, 2003, and without authorization from me or any other of his supervisors, Mr. Daniels set up office partitions and

4

office furniture in the rear of the delivery platform for him and his friends to use during breaks from work. However, the partitions and furniture were set up in a work area where forklifts frequently operate, creating a work hazard.

13. On February 5, 2003, I learned from Mr. Daniels' Work Leader, Mr. Gerald Simms, about the partitions and that Mr. Daniels set them up and placed furniture in the partitioned area. I directed Mr. Simms to have Mr. Daniels remove the partitions and furniture. Thirty minutes later, I noted that the partitions and furniture remained in place. Accordingly, I again directed Mr. Gerald Simms to tell Mr. Daniels to remove the partitions and furniture. Mr. Simms conveyed this instruction to Mr. Daniels, but after returning from lunch and seeing the partitions and furniture still unmoved, I asked Mr. Daniels to report to my office. I directed Mr. Daniels to remove the partitions and furniture. Mr. Daniels agreed to do so and then left my office.

14. The following morning of February 6, 2003, I again noted that the partitions and furniture had not been removed. Instead of removing the items as promised, Mr. Daniels and 3 other employees (Messrs. Walter Lancaster, Howard Shade, and Ronald Woody) requested that I allow them to keep the partitions and furniture in place. I denied their request because the items posed a safety hazard and ordered the partitions and furniture removed. I then directed Mr. Daniels and Messrs. Lancaster, Shade, and Woody to remove the partitions and furniture, but they did not acknowledge this instruction. Ultimately, the partitions and furniture were removed only by Mr. Shade and required him to use a forklift.

15. Because on February 5, 2003, Mr. Daniels disobeyed my orders three times in 1 day, I concluded that Mr. Daniels failed to demonstrate as a

5

probationary employee that he was suitable for continued employment by GPO. I therefore proposed that Mr. Daniels be removed from his position for improper conduct and for creating disorder and confusion in the Delivery Section.

16. Before Mr. Daniels returned to employment with GPO, Mr. Kirby became the new Chief of the Delivery Section, and I moved into my previous position as Chief of Transportation Operations in the Production Department.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 7/30/07

TERRANCE DUDLEY

CITY OF:   Washington, D.C.

I, Terrance Dudley, Chief, PG-12, Transportation operations, Production Department, U.S. Government Printing Office, hereby solemnly swear or affirm:

I am submitting this affidavit in response to questions by Investigator J.F. Deasel, to answer the complaint of discrimination by Nathanial Daniels, Jr.

For the record, I am 35 years old (10/967).

I have been advised that I am an official alleged to be responsible for the actions giving rise to this complaint, and I understand the allegations made by Mr. Daniels.

I have been in my current position about one month. Prior to becoming Chief, Transportation Operations, I was Chief, Delivery Section, and as such I was Mr. Daniels third level supervisor. I along with Paul Kirby, Assistant Chief, Delivery Section, served as selecting officials for the position of Motor Vehicle Operator, KA-5703-5, advertised under vacancy announcement numbers 02-242 and 02-243. I selected two candidates, one from each vacancy announcement, and Mr. Kirby selected the two other candidates. At no time did I consider Mr. Daniels' age during the selection process. I chose the two candidates who I felt could best do the job based on their experience.

In looking for candidates I wanted someone who had previous truck driving experience and was familiar with the Washington D.C. area. I wanted someone who knew their way around the streets of Washington. I was also looking for a candidate who was dependable and who came to work on time. The candidate also needed some communication skills, both oral and written, since the job required the selectee to interact with customers and prepare manifests.

ATTACHMENT /.

Page 1 of 4 pages

Affiant's Initials

There were about ten to twelve applicants referred to us for consideration for the two vacancies. All the candidates were interviewed and asked the same questions. Candidates were asked to describe the duties of their current job, why they applied for the job, why they felt they were the best candidates, how they would handle a confrontation with a co-worker, and several others.

I had a number of concerns with Mr. Daniels' candidacy for the job. First of all Mr. Daniels arrived late for the job interview, which was not a good sign. I also felt that Mr. Daniels did not answer the interview questions as well as some of the other candidates. I can no longer recollect what the specific questions were of the interview, nor do I recall the specific the answers. The notes we took have since been destroyed.

I selected Lamar Gamble and DeShawn McMillan for two of the four vacancies. Mr. Gamble had experience as a Motor Vehicle Operator and was quite familiar with the Washington area. His interview went well and he had experience working in the Delivery Section. He worked in the section a little longer than Mr. Daniels. He worked as a helper on the trucks and was familiar with most destinations and delivers that had to be done. He was also learning the truck routes and was becoming familiar with our customers. I believe Mr. Gambel was around the same age as Mr. Daniels when I selected him for the job.

Concerning the other candidate I selected, Ms. McMillan, she also did very well during the interview. She also had previous experience as a truck driver having worked for a local delivery service. She knew the Washington area quite well and had experience interacting with customers. I felt her overall experience made her a better candidate, even though she was working in Industrial Cleaning at the time she applied for the job.

Page 2 of 4 pages                                                            Affiant's Initials ___

Regarding Mr. Daniels' allegation that he heard me make a negative comment about older employees by stating that I would be happy when all of the old people left the unit or the section would be better off without old employees; I steadfastly deny ever making such a comment to Mr. Daniels or anyone else. I have never made a disparaging remark about any employee's age. If Mr. Daniels or any other employees claim they heard me make a derogatory comment about older employees, the individual is lying.

In summary, I selected the two people who I felt could best perform the duties of the job based on their knowledge, skills, and experience. At no time did I consider any candidate's age in the selection process.

    I have read the above statement, consisting of 4 pages, and I declare under penalty of perjury that it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_____
Signature

_____
April 8, 2003
Date

_____
Investigator's Signature

```
****************************
                              *
NATHANIEL DANIELS, JR         *
    Complainant               *
         vs.                  *           GPO-03-21
                              *
GOVERNMENT                    *
PRINTING OFFICE               *
    Defendant                 *
****************************
```

# AFFIDAVIT OF TERRANCE DUDLEY

The accepted issue in this case is as follows:

Was the Complainant discriminated against because of his age (55) and subjected to reprisal actions because of his prior involvement in the EEO process when he was allegedly (1) singled out and questioned by his supervisor on December 19, 2002 regarding a discussion that was taking place near the time clock, (2) sent home even though he had been scheduled to work overtime on February 1 and 2, 2003, and (3) on or about February 5, 2003, he was written up and subsequently terminated during his probationary period for moving salvage material?

Q: What is your current position with GPO?

A: Chief of Transportation Operations.

Q: How long have you been in that position?

A: I assumed that position on February 10, 2003. Prior to that I was the Chief of the Delivery Section.

Q: What is your date of birth?

A: October 9, 1967.

Q: What is your working relationship with Nathaniel Daniels, the Complainant?

A: Mr. Daniels works in the Delivery Section. When I was the Chief of the Delivery Section, Mr. Daniels served as a helper to the truck drivers. I did not directly supervise him. He was several supervisory levels below me.

Q: What was your work experience with Mr. Daniels?

1

ATTACHMENT 2.

6

A:  I served as Mr. Daniels Supervisor from the date of his hire until February 10, 2003.

Q:  Mr. Daniels alleges, with respect to Issue 1, that you came into the office earlier than usual on December 19, 2002 and did not let other employees know you were in. He further alleged that you came out into the work area and directed that he (Mr. Daniels) and several other co-workers including Walter Lancaster had been overheard making comments that you thought were problematic and that each of them would have to talk to you. Thereafter, he alleged that you brought him into your office and treated him in an aggressive and hostile manner. Could you please comment regarding this incident?

A:  I did come to work early on December 19, 2003 morning to complete some reports. However, in no way was I trying to hide my presence from other employees in the office. What I heard was the Complainant and Walter Lancaster discussing the time of arrival of some employees, leave usage and time card of another employee. During that discussion, they began talking about the employee's payroll number. I felt this was completely inappropriate because such information is confidential.

Accordingly, I came out of my office and directed first Mr. Lancaster and then Mr. Daniels to come into my office to discuss the situation. I explained to both Mr. Daniels and Mr. Lancaster that discussing monitoring other employees time and attendance was not relevant to their job. I was not certain that Mr. Daniels relatively being a new employee understood how important it was to maintain the confidentiality of an employee's personal information. I did not speak to him in an aggressive or hostile manner.

Q:  With regard to the second Issue, Mr. Daniels alleged that he had been told by Jerome Allgood, team leader, that he was to come in on both Saturday February 1 and Sunday 2, 2003 to work overtime. Mr. Daniels claimed that overtime work was cancelled for February 1 but he came in on February 2, 2003, as he was scheduled to do. Mr. Daniels then claimed that you wrongly told him to leave work and not receive overtime. Please comment?

A:  We offer overtime to individuals on a rotating basis. We would first offer overtime to those who had not been offered it most recently. I personally contacted Mr. Daniels and others on Friday January 31, 2003 to inform them of the change in schedule and not to report because some employees had been bumped due to Saturday cancellation of overtime. In this case of the weekend of February 2, 2003, Mr. Daniels was not supposed to be working overtime on Sunday. He had previously received overtime assignments sometime the week before. In addition, Mr. Allgood was not authorized to offer Mr. Daniels overtime.

When I observed that Mr. Daniels reported to work on Sunday, February 2, 2003, I immediately approached him. I asked why he was here at work. He stated that Mr.

2

Allgood had told him to come in. I informed him that Mr. Allgood did not have the authority to authorize overtime. I asked Mr. Allgood if he had authorized Mr. Daniels to come in and he stated, No. I told Mr. Daniels he had to leave. Mr. Daniels began to paste the floor in a hostile manner. He stated why do he have to go home and I stated that you were previously informed by me not to come in. Mr. Daniels told me that he was not going to go anywhere and then he asked whether he could stay and work. I again told him that he was not scheduled to come to work and that he had to leave. Eventually he went home.

Q: A number of witnesses claimed that the labor-management contract covering truck drivers required management to offer overtime work to the lowest graded employees first. Is this accurate?

A: No. That is not the way we do overtime. As I explained, we offer overtime in a fair and equitable manner rotating it among all employees.

Q: With regard to the third issue, Mr. Daniels alleged that he and some co-workers had put some desks and chairs in an area where they could sit. He stated that this was an arrangement similar to that of another driver, Charles Henderson. He stated that one of the supervisors, Mr. Kirby, observed the arrangement and told him to move it but did not state that he could not have it. Thereafter, he alleged that you told him to move all the desks and that he did this. Immediately after that, he alleged that you proposed to terminate him. Could you explain what happened?

A: Mr. Daniels proposed termination was not in retaliation for his previous complaint activity. The circumstances surrounding his termination are best noted in the agencies record. The agency record can be obtained by contacting the Government Printing Office of Labor & Employee Relations & Programs Division.

Q: Were you aware that Mr. Daniels had filed a prior EEO complaint?

A: Yes.

Q: Did this or Mr. Daniels age play a role in your decision?

A: No.

Q: Do you have anything further to add?

A: No.

3

## CERTIFICATION

I, Terrance Dudley, have read the above transcribed verbatim statement, consisting of 5 pages, it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000.00 or imprisoned not more than 5 years, or both.

The collection of this information is authorized by Public Law 92-261, Equal Employment Act of 1972; and Executive Order 11478 as amended. This information will be used to adjudicate complaints of alleged discrimination. As a routine use, this information may be disclosed to persons involved in the processing and/or adjudication of this complaint; to the Equal Employment Opportunity Commission or to the Merit Systems Protection Board, as appropriate, to adjudicate complaints of alleged discrimination; to a court, party or counsel for a party in judicial or administrative litigation; to a congressional office at your request; to a labor organization as may be required by the NLRA. Provision of the information requested is mandatory for the complainant, GPO employees and other federal employee witnesses. Failure of the GPO or other federal employees to provide the requested information could result in disciplinary action.

I declare under penalty of perjury that the foregoing is true and correct.

*Terrance Dudley*
Terrance Dudley

Dated: November 17, 2003

Affirmation by:

4

# Memorandum

**TO:** Chief, Employee Relations & Program Division
**DATE:** February 6, 2003
**FROM:** Chief, Delivery Section
**SUBJECT:** Additional information pertaining Mr. Nathaniel Daniels

On Wednesday morning February 5, 2003, I noticed three large partitions setup in the rear of Delivery platform. I asked both Messrs Paul J. Kirby and Lloyd C. Logan if they had authorized the partitions in Delivery Section, they both answered "No." I then proceeded to ask who placed the partitions in the area. Mr. Simms stated. " He thought Mr. Daniels placed those partitions back there." Approximately 10 minutes later, Mr. Daniels arrived back from his delivery. I called Mr. Daniels in and asked if he place those partitions in the rear of the platform. He stated, "yes." I then proceeded to explain GPO Instruction 655.4a under (Personal Conduct) # 33 and that the protocol is to initiate the proper action to transfer equipment/property, therefore the partitions were in violation of safety regulations. Mr. Daniels stated that he did not see anything wrong with having the partitions. I informed Mr. Daniels to take the partitions down. Approximately one half hour later, I noticed the partitions were still in place. I then instructed Mr. Simms to asked Mr. Daniels to take the partitions down and return them to Stores Division. After I returned from lunch, Mr. Kirby stated to me that Mr. Simms informed him that Mr. Daniels said tell Mr. Dudley to take the partitions down. According to Mr. Kirby, Mr. Daniels paused and stated "Ok." At 2:00 pm Mr. Daniels entered into my office and informed Mr. Kirby and myself that he had a meeting to attend and that he did not have a chance to hit labor or depart on time. I asked Mr. Daniels if he had taken those partitions down, he stated, "No, I will get them in the morning."

On Thursday February 6, 2003. Approximately 7:30 Mr. Lloyd C Logan informed me that Messrs. Howard G. Shade, Walter W. Lancaster, Ronald Woody and Nathaniel Daniels wanted to speak to me in reference to the partitions. I met with them and they wanted to know why they could not keep the partitions up. Once again I explained the protocol is to initiate the proper action to transfer equipment/property, therefore the partitions were in violation. At this time the partitions were still setup in the rear of delivery platform. During the meeting, I asked Mr. Daniels who helped him set the partitions up. He stated, "all of us." I then gave a direct order to the aforementioned names to take the partitions down and return them to Stores Division immediately.

ATTACHMENT 3.

Again, Mr. Daniels actions seem to cause unnecessary disruption in the work place.

*Terrance Dudley*
Terrance Dudley