UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATHANIEL DANIELS, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>WILLIAM H. TURRI, )<br>ACTING PUBLIC PRINTER )<br>U.S. Government Printing Office, )<br>)<br>Defendant. ) | Civ. Act. No. 05-245 (GK) |

### DECLARATION OF PAUL KIRBY

I, Paul Kirby, hereby declare:

1.   I was Assistant Chief of GPO's Delivery Section until the end of February, 2003. I became Assistant Chief of the Delivery Section in February of 2000, and served in that position for approximately 3 years. As Assistant Chief of the Delivery Section, I was the second line supervisor of the section and all of its employees, including the Plaintiff in the above captioned matter, Mr. Nathaniel Daniels. I became Chief of the Delivery Section toward the end of February, 2003. In September of 2006, I assumed my current position, which is Supervisory Distribution Facility Specialist in the Transportation and Logistics Branch of GPO's Plant Operations Division.

2.   I have been asked to review certain statements and documents I signed concerning the events that Mr. Daniels claimed were discriminatory in the TWO administrative complaints of discrimination he filed with GPO (Agency EEO Complaints Nos. 03-09 and 03-21), which are now the subject of the above-captioned matter in the U.S. District Court. I have reviewed these documents (set forth as Attachments 1 and 2 to this affidavit) and reiterate


GOVERNMENT EXHIBIT 5

my belief that they are true and accurate. However, I would like to take this opportunity to further explain that I did not discriminate against Mr. Daniels.

3. On or about October 2, 2003, Terrence Dudley, the Delivery Section's Chief, conferred with me about dividing between ourselves the decisions to fill four vacant Grade 5 PPW Motor Vehicle Operator positions. Mr. Dudley delegated the selection decisions under VA 02-243 to me, while Mr. Dudley made the selection decisions under VA 02-242. *Id.*

4. From VA 02-242, I selected Mr. Christopher Silas and Derron Williams. My selection criteria focused on experience driving delivery vehicles in the Washington, DC, region and experience physically loading and unloading heavy materials for delivery. With these standards in mind, I selected Christopher Silas because he worked for the Fairfax County Water Delivery Authority driving 4-panel delivery vans and 5-ton International dump trucks to construction sites. Mr. Silas also loaded and unloaded heavy construction materials into the delivery trucks and unloaded these materials at the delivery sites. Applying these same selection criteria, I selected Derron Williams for the remaining Motor Vehicle Operator position. I noted that Mr. Williams previously drove a 26-foot International delivery truck and a 20-foot Freight Line delivery truck while he worked for Allstate professional movers, and that he picked up and delivered heavy objects (such as furniture and on one occasion a safe) from various locations in the Washington, DC, area including Federal agencies.

5. My decision to select Mr. Silas and Mr. Williams for the Motor Vehicle Operator positions was solely because of their superior experience

2

driving delivery vehicles in the Washington, DC, region and their loading/unloading experience. The candidates' ages played no role in the selections. *Id.* In contrast to the selectees, Mr. Daniels experience was less impressive to Mr. Kirby. Def. Exhibit 6. I noted that Mr. Daniels' experience did not include driving delivery vehicles in the Washington, DC, region, but was limited to delivering mail and small packages while driving a jeep for the U.S. Postal Service in Baltimore, and driving a 15-passenger van for the Johns Hopkins University Hospital in Baltimore, MD. I was also aware that Mr. Daniels' delivery experience while working as a PPW-1 in the Delivery Section was limited in scope: he helped GPO drivers make deliveries of the Congressional Record solely to Capitol Hill.

6. Before Mr. Daniels returned to employment with GPO, I became the new Chief of the Delivery Section, and Mr. Dudley moved into his current position as Chief of Transportation Operations in the Production Department. I was told by Mr. Jeffrey Bernazzoli (currently retired), former GPO Production Manager), that Mr. Daniels was returning to GPO and that the removal penalty for the misconduct cited in the February 21, 2003, removal letter was being changed to a verbal warning because Messrs. Lancaster, Shade, and Woody only received verbal warnings for the incident involving the partitions.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 5/31/07

PAUL KIRBY

3

```
*******************************
                              *
NATHANIEL DANIELS, JR         *
     Complainant              *
         vs.                  *      GPO-03-21
                              *
GOVERNMENT                    *
PRINTING OFFICE               *
     Defendant                *
*******************************
```

## AFFIDAVIT OF PAUL KIRBY

The accepted issue in this case is as follows:

Was the Complainant discriminated against because of his age (55) and subjected to reprisal actions because of his prior involvement in the EEO process when he was allegedly (1) singled out and questioned by his supervisor on December 19, 2002 regarding a discussion that was taking place near the time clock, (2) sent home even though he had been scheduled to work overtime on February 1 and 2, 2003, and (3) on or about February 5, 2003, he was written up and subsequently terminated during his probationary period for moving salvage material?

Q:   What is your current position with the Government Printing Office (GPO)

A:   Chief of the Delivery Section

Q:   What is your age?

A:   I am 30 years old. (DOB: 10/3/72)

Q:   What is your working relationship with Nathaniel Daniels, the Complainant?

A:   I am a higher-level supervisor. At the time these allegations took place, I was the Assistant Chief for the Delivery Section and Terrance Dudley was the Chief of the Delivery Section. Mr. Daniels began working in the Delivery Section during February of 2002. He had to perform appropriately for a one-year probationary period before he became a permanent employee.

Q:   What was your work experience with Mr. Daniels?

A:   Mr. Daniels was an employee that management had some difficulties supervising from time to time. For example, we received a complaint that Mr. Daniels had come

1


ATTACHMENT 1

7

to another Section Chief and was badgering him about being selected for a position. We had a second problem with Mr. Daniels. He had a habit of going up to the 7th Floor to the Congressional Records Office without any reason to do so. Management told him not to do this. Despite this, Mr. Daniels would still go to the 7th Floor thus ignoring the directives from managers.

Q: The Complainant alleged that on December 19, 2002, Mr. Dudley came to the office earlier than usual and did not make himself known to employees. Thereafter, he alleged that Mr. Dudley came out into the work area, directed that he (Mr. Daniels) and several other co-workers including Walter Lancaster had been overheard making comments that Mr. Dudley found problematic and that each of them would be talking to Mr. Dudley. Thereafter, he alleged that Mr. Dudley brought him into the office and treated him in an aggressive and hostile manner. Were you familiar with this incident?

A: No. I have no knowledge of that incident.

Q: With respect to issue 2, Mr. Daniels alleged that he had been told by Jerome Allgood, a Team Leader, that he was to come in on both Saturday February 1 and Sunday February 2, 2003, to work overtime. Mr. Daniels claimed that the overtime work was cancelled for February 1 but that he came in on February 2, 2003, he came in as he was scheduled to do. Mr. Daniels then claimed that Mr. Dudley told him to leave the work area on Sunday February 2, 2003. Are you familiar with this incident?

A: Yes. I need to explain about the operation. Mr. Lloyd Logan works on the 5:00am to 1:30pm shift. He assists drivers in the delivery of various Government documents. He is primarily involved in the delivery of the Congressional Record. On the weekend in question, the Congressional Record was scheduled to be sent out on Saturday according to Mr. Logan. Initially, therefore, Mr. Daniels was told to come into work on Saturday.

What happened was that we learned the Congressional Record would not be ready to be delivered on Saturday, February 2, 2003. Accordingly, Mr. Daniels was called and told not to come to work on that date. He did not come to work.

On Sunday, the budget was scheduled to go out. Our plan was to have employees on the later shift have an opportunity to have overtime and handle the delivery of the budget. Mr. Daniels was not supposed to be working on Sunday, February 2.

It appears there was some possible misunderstanding regarding this because Mr. Daniels did show up for work on Sunday, February 3, 2003. As I explained above, he was not scheduled to work on that date. In addition, Mr. Allgood, a Work Leader,

2

does not have the authority to schedule overtime for employees. When Mr. Dudley observed that Mr. Daniels was there, he requested that Mr. Daniels leave since he was not scheduled for work on that date. This had nothing to do with Mr. Daniels= age or the fact that he may have filed an EEO complaint. At that time, only Mr. Dudley, Mr. Logan or Myself had the authority to assign overtime. Mr. Daniels was not informed to work on Sunday by either supervisor.

Q: With respect to the third issue, Mr. Daniels alleged that he and some co-workers had put some desks and chairs in an area where they could sit. He stated that another driver, Charles Henderson, had set up a similar arrangement. He further stated that you observed the arrangement and told him to move it but did not state that he could not have it. Thereafter, he alleged that Mr. Dudley told Mr. Daniels to move all the desks and that he did this. Immediately thereafter, he stated that Mr. Dudley terminated him. Could you please explain what happened?

A: Yes. I need to provide some background in order to explain the situation here. The events in question took place over two days. On the first day, I was in the Delivery Section work area when I observed a desk and several chairs that were near an elevator. The desk and chairs didn't appear to be against GPO regulations because their were chairs all over the platform. The only problem at the time was the location of the chairs and table. This was in a relatively small area that had a women=s bathroom. Because the forklift unloads things from the elevator, I told Mr. Daniels that he needed to move the desk and chairs away from that area for safety reasons.

When I came into work the next day, Mr. Dudley asked me to step out of my office and directed me to a different part of the work area where Mr. Daniels had not only set up the desk and chairs but he added more furniture including dividers which had the effect of creating a series of cubicles. This set up was in a work area where forklifts also come in. Mr. Dudley and I concluded that this was actually a dangerous situation and Mr. Dudley directed that Mr. Daniels remove the chairs desks and partitions.

Q: Was this at all related to the decision to terminate Mr. Daniels?

A: Yes. Mr. Dudley felt, and I agreed, that Mr. Daniels had exhibited certain problems during his probationary period. As I noted above, management identified two instances in which Mr. Daniels had engaged in conduct that we did not think was appropriate. The instance with the chairs, desks and partitions was the third incident. In that case, Mr. Daniels had set up office furniture and office partitions in a work area where forklifts frequently are in operation. By doing so, he subjected that area into an hazardous work area. Because he was in his probationary period,

3

management understood that Mr. Daniels could be terminated if we had concerns. We decided based on these incidents that it was better to go ahead and terminate Mr. Daniels. The paperwork was supposed to be issue to Mr. Daniels on a certain day. Mr. Daniels instinctively took off on that day which delayed to termination process after the probationary.

Q: What happened next?

A: As I understand it, Mr. Daniels learned that his termination was being proposed. Accordingly, he instinctively did not report to work. Because of his absence, the termination process was delay beyond his probationary period. Therefore, Mr. Daniels was not given proper notice. Initially, the paperwork went through to terminate him. Mr. Daniels was brought back to work in the Delivery Section because he was not given proper notice.

Q: Were these decisions in anyway related to his age or his prior EEO activity?

A: No.


Q: Do you have anything further to add?
A: No.

## **CERTIFICATION**

I, Paul Kirby, have read the above transcribed verbatim statement, consisting of 5 pages, it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

> Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000.00 or imprisoned not more than 5 years, or both.

The collection of this information is authorized by Public Law 92-261, Equal Employment Act of 1972; and Executive Order 11478 as amended. This information will be used to adjudicate complaints of alleged discrimination. As a routine use, this information may be disclosed to persons involved in the processing and/or adjudication of this complaint; to the Equal Employment Opportunity Commission or to the Merit Systems Protection Board, as appropriate, to adjudicate complaints of alleged discrimination; to a court, party or counsel for a party in judicial or administrative litigation; to a congressional office at your request; to a labor organization as may be required by the NLRA. Provision

5

of the information requested is mandatory for the complainant, GPO employees and other federal employee witnesses. Failure of the GPO or other federal employees to provide the requested information could result in disciplinary action.

I declare under penalty of perjury that the foregoing is true and correct.

Paul Kirby

Dated: 10/29/03

Affirmation by:

Jonathan E. Kaufmann

CITY OF:   Washington, D.C.

I, Paul Kirby, Chief, Delivery Section, Production Department, U.S. Government Printing Office, hereby solemnly swear or affirm:

I am submitting this affidavit in response to questions by Investigator J.F. Deasel, to answer the complaint of discrimination by Nathanial Daniels, Jr.

For the record, I am 30 years old (10/3/72).

I have been advised that I am an official alleged to be responsible for the action giving rise to this complaint, and I understand the allegations made by Mr. Daniels.

I have held my current position officially since March 24, 2003, however, I was Acting Section Chief for about one month before it became official. Prior to becoming Section Chief I was the Assistant Section Chief, Delivery Section for about two years. As Assistant Section Chief, I along with Mr. Terence Dudley, Section Chief, Delivery Section, served as selecting officials for the position of Printing Plant Worker, Motor Vehicle Operator, KA-5703-5, advertised under vacancy number is 02-242 and 02-243. I selected two candidates and Mr. Dudley selected two candidates. I chose the two candidates who I felt could best perform the duties of the job based on their knowledge, skills, and abilities. I never considered any candidate's age during the selection process.

The duties of the contested vacancy require the driver to operate small trucks and deliver printed materials to our customers. Usually the driver of the smaller vehicles would work alone and hand deliver the printed materials to our customers.

In assessing candidates I wanted someone who was dependable, who had some experience driving a truck, and someone who knew Washington D.C. well.

Page 1 of 3 pages

Affiant's Initials PK

ATTACHMENT 2.

I also wanted someone who had the most experience in interacting with customers for receipt and delivery.

There were about 10 to 11 people who were referred to us for the 4 vacancies. I believe all the candidates, including Mr. Daniels were good candidates. Our job was to determine who where the best candidates.

All the candidates were interviewed for the job were asked the same questions. I thought Mr. Daniels interview was good. In addition, I thought he showed himself to be a good worker while working as a helper in the Delivery Section. While I thought he was a good candidate, I did not think he was one of the best two candidates. I felt that Mr. Salis and Mr. Williams were both better candidates than Mr. Daniels and I selected both of them for the vacancy.

In addition, while he indicated experience as a driver, he did not show any experience in customer service. In addition, Mr. Daniels was not as familiar with the city as the other candidates.

In selecting Mr. Salis and Mr. Williams, I felt both were excellent candidates. Each were intimately familiar with the Washington D.C. area. Both have previously worked as truck drivers for delivery service in Washington. Each indicated that they had experience hand delivering materials and interacting with customers. In fact I believe either 1 or both of the selectees actually delivered to some of the same building as we deliver to.

The fact is in no time did I consider any candidate's age. I selected the candidate I felt could best do the job based on their experience. While Mr. Daniels was qualified, I did not believe he was one of the best qualified candidates.

Page 2 of 3 pages

Affiant's Initials PK

I have read the above statement, consisting of 3 pages, and I declare under penalty of perjury that it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_____
Signature

4/4/03
_____
Date

_____
Investigator's Signature

Page 3 of 3 pages

Affiant's Initials _____